BURBRIDGE *v.* ARKANSAS LUMBER COMPANY.

Opinion delivered April 5, 1915.

1.  TIMBER DEEDS—CONSTRUCTION.—Timber deeds, if their terms are not ambiguous, should be construed without the aid of testimony aliunde, and if the intention of the parties can not be ascertained from the written instruments, other evidence is admissible, in case of ambiguity to show what the meaning of the contracts is.

2.  TIMBER DEEDS—REMOVAL OF TIMBER—REASONABLE TIME.—Where timber was deeded to appellees with the right to remove the same as expeditiously as possible, in determining the question of a reasonable time, it is proper to take into consideration the location of the land, its accessibility, the character and quantity of the timber thereon, the seasonableness of the weather, and the facilities obtainable for cutting and removing the timber, and all other conditions and circumstances which might affect the cutting and removing of the timber.

3.  TIMBER—SALE OF—REMOVAL—EXPEDITIOUS REMOVAL.—Timber was deeded to appellees with the agreement that the same would be removed as expeditiously as possible. Some of the timber was many miles from appellee's mills, and could be reached only as appellees constructed railroads to the same. Appellees did not begin cutting timber on some of the tracts within ten years after the date of the contract. *Held*, the parties were aware of the conditions under which appellees had to work, and that as appellees were building railroads to the timber and were all the time running their mills at full capacity, and the time limited in the contracts for cutting the timber had not expired, that appellees were proceeding expeditiously under their contracts, which would be upheld, as against subsequent purchasers of the timber from the same grantors.

4.  TIMBER—SALE—SALE TO AGENT.—Timber was sold to certain agents of appellee company, the vendors knowing that it was for the

use of the appellee company. *Held,* as against a subsequent vendee, to whom the original vendor later sold the timber, that appellee stood in the same position as if the timber had been sold directly to it.

5.  TIMBER—CONTRACT OF SALE—REMOVAL.—Under a contract to cut and remove timber expeditiously, *held,* under the evidence that the vendee was proceeding with proper dispatch to remove the timber as expeditiously as possible.

Appeal from Bradley Chancery Court; *Zachariah T. Wood,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

The title to timber on about 4,000 acres of land is involved in this controversy. Twenty separate suits were instituted against the appellees, the Arkansas Lumber Company, the Bradley Lumber Company and the Southern Lumber Company, independent lumber manufacturing corporations, with their mills located at Warren, Bradley County, Arkansas, to cancel and set aside as a cloud on their title to the lands, certain timber deeds in each one of which one of said lumber companies was grantee.

Six suits were brought against the Arkansas Lumber Company, nine against the Bradley Lumber Company and five against the Southern Lumber Company, and the cases involving the same questions were consolidated for trial.

The parties all claim from a common source of title, the grantors in the timber deeds to the different lumber companies having afterward conveyed the timber on the same lands to appellants and all the conveyances to the different corporations of the timber are by deeds substantially alike, except as to name of grantor, lands described, consideration paid and the term of years mentioned in the clause relating to the time allowed in which the timber could be cut and removed, one of which deeds is as follows:

## Timber Deed.

This indenture, made this 1st day of April, A. D. 1905, by and between Eliza Green, party of the first part, unto and with the Southern Lumber Company, party of the second part.

Witnesseth, That said party of the first part being the owners, in fee simple, and in possession of the following lands, lying and being situated in Bradley County, Arkansas, towit (description). For and in consideration of the sum of (consideration), the receipt of which is hereby acknowledged, has this day granted, sold and conveyed unto said party of the second part and its lawful successors and assigns forever all the pine timber over twelve inches in diameter on said lands, and enough of the smaller timber for skid poles in removing said timber from the land.

It is agreed, That said party of the first part shall pay all taxes and assessments levied against said lands and keep the same free from all alienation and incumbrance, except such as may be subordinate and subject to this indenture; and that any failure by said first party to pay such taxes and assessments by the third day before the time for the payment of the same shall expire shall be construed to be an authority to the party of the second part to pay the same, for which a lien on said land may be declared as now by law given to agents and others paying taxes on lands of others at their request.

The party of the second part shall cut and remove said timber as expeditiously as possible, and it is agreed that unless it shall have removed all the same within a period of ........ years from the date hereof, that it shall be responsible for and pay to the first party the full amount of taxes assessed against said lands after the expiration of said period of ........ years from this date until such time as said timber is removed and said possession returned to said first party. The said second party shall have free and uninterrupted possession of said land during the terms of this indenture and for the

purpose herein set forth, and shall have free ingress and egress thereto and therefrom, with the right to build and operate tram or railroad onto or across said land for the purpose of transport or transporting the timber therefrom, or for transportation of timber belonging to or that may belong to said second party, and to this end shall be regarded as the holder of said land, to sue for and recover the same from all persons whatever, holding or attempting to hold the same; provided, that the said first party, its heirs or legal assigns, may retain such possession of said land, at all times, as shall not interfere with the right of the second party under this deed for the purposes aforesaid. * * *

It is further agreed, That whenever said timber shall have been removed, the party of the first part shall enter full possession of said land at once, whether the time for such removal be expired or not; provided, that all right of railroad herein granted shall be perpetual; said right-of-way not to be less than fifty feet wide, and may be used for a regular freight and passenger railroad.

And the said party of the first part does hereby covenant with the second party and its lawful assigns and successors that he will forever warrant and defend the title of said timber, and right-of-way, against all lawful claims whatsoever.

(Relinquishment of dower by wife.)

The period of greatest activity of buying timber and timbered lands by the defendant companies, and during which the deeds to the timber in controversy were executed, except for two or three tracts, was for the Bradley Lumber Company from 1902 to 1905, and for the Arkansas and Southern lumber companies from 1904 to 1909. The mills of the said companies upon which the timber was to be manufactured are all located at Warren in the northeast part of Bradley County.

The Arkansas Lumber Company started in 1901 with a mill of about 50,000 feet daily capacity, which was later

replaced with a mill of daily cutting capacity of 150,000 feet.

The Bradley Lumber Company mills, when first erected, had a daily capacity of 50,000 feet, but were afterward burned and replaced with a new mill with a daily capacity of 100,000 feet.

The mills of each company have been continuously operated to the limit of their full capacities from the time they were constructed until now, except during the time necessary to replace the plants of two of the companies that were destroyed by fire, one company's plant being twice destroyed; and frequently they have been run at night.

There is no question but that the lumber companies paid the market price of the timber at the time of its purchase and conveyance to them, and all the parties knew its distance from the mills and understood that it had to be cut and transported to the mills at Warren for manufacture over trams and logging railroads that were being and to be constructed, by the different lumber companies, from the mills to the timber.

At the time the mills were erected there were no railroads in Bradley County except the Iron Mountain, which ran east from Warren to Dermott, in Chicot County.

The most of the timber conveyed by the deeds involved herein was situated from twelve to twenty and thirty-five miles from Warren, the place of manufacture.

There was also in 1901 a logging road about three miles long, the Crandell & Levitt, running from Warren westward. It was later chartered as the Warren & Ouachita Valley Railway and extended to Banks in Bradley County, a station on the Chicago, Rock Island & Pacific Railroad, which was constructed through the county during 1906 and 1907 from the northwest border to the southeast, its nearest point to Banks being at Warren about sixteen miles distant.

There are some creeks, the Lagles, running north and south through Bradley County with low, flat banks and wide bottoms from one-half to one and a half miles, which are overflowed about half of the year, and constitute a natural barrier to the removal of logs from one side to the other, which it is not practical to do without the construction of a permanent log road.

L. J. Burbridge, one of the appellants, claims title to 2,795 acres of timber, under deeds executed in 1911 and 1912, from appellees' grantors for a recited consideration of one dollar in most of the conveyances, and the other appellants claim about 880 acres. The deeds conveying the timber to the Southern Lumber Company, now claimed by Burbridge, were executed from 1905 to 1909, and the shortest time mentioned in the clause granting the right to remove the timber is twenty-one years in a deed made in 1909; all the others designate thirty years except one which allows thirty-five years.

The deeds conveying the timber to the Arkansas Lumber Company, claimed also by Burbridge, were executed none earlier than 1904, none later than 1907, except one in March, 1912, which fixes the time of removal definitely at five years. The shortest time for removal of the timber recited in its other deeds is twenty years, and the longest is thirty years. The earliest date of execution of any conveyance of timber involved in this controversy to either the Southern or Arkansas Lumber Company is a deed from Hattie Edrington to the Southern Lumber Company executed December 12, 1901, reciting a period of twenty years for the removal of the timber, which was cut and removed in 1912.

None of the deeds executed to said appellees, the Arkansas Lumber Company and the Southern Lumber Company, conveying timber claimed by other appellants than L. J. Burbridge mention a shorter period of time for the removal of the timber than twenty years, nor longer than thirty years.

The procedure for railroad construction for transportation of the timber was to build a main line in the general direction of the larger bodies of timber and to build laterals, or logging spurs from it out into the timber on the different tracts, and cut and remove the timber over these laterals, spurs and the main line to the mills at Warren. The timber accessible, or that could be reached within a reasonable haul, was cut along one side of the logging spur, down and around the end thereof and back up the other side, so that the steel of which the logging spur was constructed could be taken up and laid in another direction either on the main line or other spurs, and thus, by continuous building of the main line and the laying, taking up and relaying the steel on the logging spurs, the companies were enabled to construct facilities to transport sufficient timber to keep the mills supplied with logs, proceeding all the while toward and into the timber.

The Bradley Lumber Company began to build its logging road in 1902 and to cut and remove such timber as it had upon its road and accessible to it. It had not cut or removed any timber from any lands in the immediate vicinity of the lands, the timber on which is involved in these suits, except in two instances, and in those the company had just reached and was preparing to cut and remove the timber when the suits were filed.

There was no railroad building in the county except by the lumber companies until 1906 and 1907, when the Rock Island was constructed through it. By the time that road was finished the Bradley Lumber Company's road had reached a length of about twelve miles south of Warren, and turned west toward a body of its timber in township 14, range 10. It was having trouble to get cars enough to ship out its lumber, and concluded to build across and make a junction with the Rock Island Railroad at Hermitage, which it did, and logged its mill from timber then gotten down in township 14. After forming the junction with the Rock Island, it facilitated the removal

and manufacture of its timber by getting trackage privileges from that road, and dropped down into township 15, range 10, below Hermitage, and built spurs out from the Rock Island, and during a part of 1908 and 1909 logged its mill from that locality. When the timber there was cut it went into township 17, range 10, made accessible by the use of trackage privileges on the Rock Island Railroad, which were denied after the close of 1910 on an order of the Interstate Commerce Commission, and logged its mill from that locality for a few months. It continued, during all this time, building its own main line south, so when it could use the Rock Island tracks no longer it would have its line sufficiently far south and near its timber to throw out logging spurs and get timber enough to keep its mill running constantly.

It would have reached and cut the timber on the lands of six of the parties to the suit within less than one year. It cut no timber west of the Lagles, never having operated on that side of the creeks. Its original plan was to cut its timber east of the Lagles and then across and it later decided to exchange, if possible, its timber lands on the west of the Lagles with the Arkansas and Southern Lumber Companies that were operating in that territory, for some of their timber accessible to its road, but had not been able to do this except to exchange small tracts of timber with said companies when they reached same in their operations. Just before the suits were commenced it had traded the timber on the Neal lands to the Arkansas Lumber Company, which was proceeding to cut it when the suits were commenced. It had not been able to effect the exchange of timber on the other lands, the filing of the suits preventing it. This company was not able to make any arrangements with either of the other appellee companies to use their log roads or logging spurs nor to have its timber hauled over them.

Early in 1902 the Southern and Arkansas Lumber Companies began reconstructing and extending the Crandell & Levitt road westward through their timber in the

north end of Bradley County, using it to transport logs to their mills, and cutting the timber as the road was extended.

In 1907 they had reached a point sixteen miles west from Warren, where Banks is now located. This road was chartered as the Warren & Ouachita Valley Railway, and connected at Banks with the Rock Island, which was constructed through the county in that year.

These companies then hauled their logs over the Rock Island Railway to Banks, its connection with their road, and removed some short time timber from lands sold the Rock Island for town sites, and the timber they had purchased in and around Vick on that road, which was the only timber they could reach at the time and keep their mills running.

In 1908 they began, jointly, the construction of a logging railroad, the Arkansas & Southern, from Banks in a southwesterly direction to their timber holdings on the west side of the county. This road was constructed for about twelve miles through territory in which neither of said appellees owned any timber, and no timber from any of the lands in controversy could have been removed by either of them upon a reasonable wagon haul sooner than the latter part of 1911, except from the Edrington tract, and the removal of that timber was postponed at the request of the husband and agent of appellant, who desired to cut and deliver it.

All the timber included in the suits of Edrington against said appellees is in township 16 south, ranges 9, 10 and 11 west; and the nearest tract in his suit against the Southern Lumber Company to its mill or its railroad or to any railroad at the time the timber was purchased and conveyed was a distance of over nineteen miles. The nearest tract involved in his suits against the Arkansas Lumber Company to its mill or any railroad at the time it was bought by that company was over eighteen miles. The nearest timber in the suits of the other appellants against the Southern Lumber Company to their mill or

any railroad was about fourteen miles distant when purchased, some of the other tracts being as far from the mill and railroad, when bought, as twenty-two miles. The nearest tract of timber involved in Burbridge's suits against the Arkansas Lumber Company to its mill plant or any railroad, when bought, was fourteen miles distant, and the farthest twenty-one miles.

Nearly all the timber claimed by appellants in the various suits against appellees at the time it was purchased by appellees was a virgin forest in a wilderness primeval.

Each of appellee companies have large holdings of timber and timbered lands of from seventy-five to eighty thousand acres.

The testimony on the part of appellants shows that it was possible for the lumber companies to have built their logging roads and spurs to the different tracts of timbered lands in controversy and cut and removed the timber after its purchase before the bringing of the suits, if they had built their roads directly to these tracts of timber without building them as they did, to reach all their timber in the most practical way, and without regard to the cost of such construction of facilities.

The court found that the appellees, the lumber companies, were proceeding in the removal of the timber in controversy within their rights under the conveyances thereof to them, and that the appellants were without right under their later conveyances to the timber, and decreed accordingly, and from this decree appellants bring this appeal.

*Samuel Frauenthal* and *E. E. Williams,* for appellants.

1. Both parties derive title from the same source. 109 Ark. 499. Where the time has expired under the terms of timber deeds within which to cut and remove the timber from the land the original grantor or his grantees may institute suit to cancel the deeds as a cloud upon the title. The failure or refusal to cut the timber within

the time specified in the deed is equivalent to an abandonment of it. 109 Ark. 499; 97 *Id.* 167; 169 S. W. 957. Where the conveyance specifies a particular time for the removal of the timber, the purchaser forfeits all right in the timber not removed within the time specified. 55 L. R. A. 513; 4 A. & E. Ann. Cas. 1047; 77 Ark. 117; 99 *Id.* 112; 111 *Id.* 253.

2. Where no time is mentioned the purchaser has a reasonable time in which to enter and cut and remove the timber. 77 Ark. 117; 78 *Id.* 408; 84 *Id.* 603; 91 *Id.* 292; 61 *Id.* 315; 70 *Id.* 123; 93 *Id.* 447. Inconvenience or hardships, or cost do not excuse a breach of condition. See cases, *supra,* and 104 Ark. 475.

*B. L. Herring, Fred L. Purcell* and *D. A. Bradham,* for appellees.

1. The time had not expired for the removal of the timber. 99 Ark. 112; 77 Ark. 116.

2. Where no time is named in a timber deed for the removal of the timber it means ''a reasonable time.'' 77 Ark. 116; 78 *Id.* 408; 84 *Id.* 603; 91 *Id.* 292; 93 *Id.* 5; 99 *Id.* 112; 111 *Id.* 253.

What is a reasonable time is a question of fact under all the circumstances. 25 Cyc. 1554; 121 Ga. 882; 49 S. E. 831; 17 Cyc. 662 (10), 668-9; 93 Ark. 5; 13 *Id.* 116; 25 Cyc. 1553 (b).

3. The chancellor found that appellees had not had a reasonable time with proper dispatch to cut and remove the timber, and this finding is supported by the evidence.

Kirby, J., (after stating the facts). Appellants insist that they are entitled to have the deeds to appellees cancelled as a cloud upon their title and recover the timber conveyed therein, within the authority of *Earl* v. *Harris,* 99 Ark. 112; *Yelvington* v. *Short,* 111 Ark. 253, and *Newton* v. *Warren Vehicle Stock Co.,* 116 Ark. 393, 173 S. W. 819.

The deeds conveying the timber to appellees all contain clauses requiring the removal thereof ''as expedi-

tiously and possible," identical with those construed in
the above causes, except as to the time mentioned, which
was twenty, twenty-one, thirty and thirty-five years
herein, and the additional clause, "It is further agreed
that whenever said timber shall have been removed, the
party of the first part shall enter full possession of said
land at once, whether the time for such removal be ex-
pired or not."

In the first of those cases the time mentioned had
expired, likewise in the second, while in the third it was
not more than one-half expired, but in each of them there
was a cessation of work after the timber was commenced
to be cut and removed, and the excuse was the low price
of the manufactured product caused by a financial panic
and the inability of the company to continue operations.
The failure in another instance to procure labor at all
times when the weather conditions were favorable to the
cutting and removal of the timber, and the removal of
the mill, which was expected to be used in the manufac-
ture of the timber, from its location near the timber in
the Harris case.   There has been no cessation of activity
upon the part of any of appellees from the time they be-
gan the purchase of timber in Bradley County in the cut-
ting, removal and manufacture of same.   Each of said
companies owns large tracts of timber and timbered lands
from 75,000 to 80,000 acres, situate in different parts of
the county, and all involved in this controversy, as the
undisputed testimony shows, situated great distances
from the mills where it was expected to be manufactured
into lumber, as all the parties to the transaction knew,
when the timber was sold, and the conveyances made.

They also knew that the timber was to be transported
or carried to the mills over log railroads and trams to be
constructed by the different lumber companies, each deed
granting a right-of-way for such railroads and trams
over the land on which the timber was conveyed for its
removal and the transportation of other timber owned or
after acquired by the grantee.   There was only one log

road about three miles long in the county when most of the timber conveyances were made to appellees, and the Southern Lumber Company and the Arkansas, extended it westward, cutting their timber as they went, in the north end of the county, until they reached Banks, sixteen miles distant, a station on the Rock Island Railroad, which was constructed in 1907. These two companies then made arrangements with the Rock Island Railroad Company for trackage rights and hauled some timber from further down in the county, over its line and their own road, the Warren & Ouachita Valley Railroad. This was their only timber that could be reached during the time it was cut since it was necessary for them to construct a log road twelve miles through territory in which they had no timber in order to reach their other timber and this road was constructed during the two years the timber was hauled over the Rock Island line, shortly after which period their contract with the Rock Island was cancelled by the ruling of the Interstate Commerce Commission.

One of these mills had in the meantime increased its sawing or cutting capacity from 45,000 feet daily to 150,000. Immediately upon the completion of the twelve miles of road jointly by the Arkansas and Southern Companies, each began building from its terminus independent log railroads and spur tracks and cutting and removing its timber within reasonable hauling distance thereof. Neither of these companies had any right to, nor agreement for, the use of any of the facilities of the other company for the transportation of timber to its mills, except the joint arrangement of the Southern and Arkansas Companies over the Warren & Ouachita Valley Railroad and the Arkansas Southern, jointly constructed by them. All are rival concerns in their operations in the purchase of timber and manufacture of lumber in Bradley County and each was reaching its own timber with all dispatch consistent with the continuous operation of its mill plant at full capacity and the difficulties to be overcome in the

building of log railroads and cutting and removing the timber. The proof on the part of appellants shows that the timber upon these lands had been conveyed by deed to appellees more than ten years before the suits were brought, that none of it had been cut or removed from any of the tracts of land within that time and that each of said lumber companies had sufficient means and facilities at hand to have built roads and reached and removed the timber from these lands before the bringing of these suits, if they had constructed their railroads directly to this timber in the beginning, instead of as they were constructed to other lands, for the removal of timber therefrom and without regard to the practical operation of their plants and the extraordinary expense of doing so.

All the parties to the timber deeds knew the location of the mills, how the timber was to be carried to the mills for manufacture, and knew the facilities and lack of facilities for transporting it at the time of making the conveyances, and these facts were recognized when the conveyances were made as appears in the clause thereof, providing for the removal of the timber, each of which recites that unless it shall have been removed within a period of twelve, twenty, thirty or thirty-five years, as the case may be, that the lumber company shall pay the taxes on the land after the expiration of that period until such time as the timber is removed.

A like clause in the deed was construed in all three of the aforesaid cases, the court holding that the parties intended that the grantee should cut and remove the timber from the land as expeditiously as possible and that it was within their contemplation at the time of the execution of the deed, that it might take the grantees longer than the number of years recited therein from the date of the execution of the deed in which to cut and remove the timber, although he proceeded with the expedition required, that he was required to begin to cut and remove the timber promptly after the contract was made and should continue to do so as expeditiously as possible, until

it was all cut and removed. It was said in the Harris case:

"While this was considered essential, yet it was thought by the parties that, under the conditions and circumstances then surrounding the land and the removal of the timber therefrom, it might take the defendant longer than five years in which to cut and remove the same, though he proceeded with proper dispatch, and in that event it was agreed that he should have longer than five years in which to cut and remove the same; and, the length of time which he should have after the five years not being specified, defendant had a reasonable time after the five years in which to remove the timber if he proceeded during all such time as expeditiously as possible. The specification of five years was made, we think, only for the purpose of fixing the amount which the defendant should pay for the timber. * * * In any event, he was required to cut and remove the timber as expeditiously as possible, and he did not therefore have either five years or any other definite time in which to cut and remove the timber if he did not proceed continuously with all possible expedition from the date of the deed."

In *Newton* v. *Warren Vehicle Stock Co., supra,* it is said: "Upon the authority of those two cases we must hold that the contract in suit did not give absolutely and in all events any definite time for the removal of this timber. The purpose of this contract was to require the timber to be removed expeditiously, and sufficient time for that purpose was given. This might exceed ten years, or it might not require that length of time; but the right to cut and remove the timber expired when a reasonable time had been given for its expeditious removal."

The intention of the parties must be gathered from the written instrument executed, and it can not be done without all the words and provisions thereof are considered, as said in *Earl* v. *Harris,* 99 Ark. 112.

"In order to arrive at the intention of the parties as to the time in which the timber under this contract should

have been cut and removed, all parts of the above provision must be taken into consideration. No word should be treated as surplusage and disregarded, if any meaning which is reasonable and consistent with the other parts thereof can be given to it. This provision of the contract or timber deed should be construed, therefore, so that each part should take effect." (Citing cases.)

(1-2) The timber deeds, if their terms are not ambiguous, should be construed without the aid of testimony *aliunde,* and if the intention of the parties can not be ascertained from the written instruments, the other evidence is admissible in case of ambiguity then to show what the meaning of the contract was. There was no attempt made in this case to alter, vary or amend the terms of the written contracts by parol evidence, although the testimony introduced conduces to show that the parties to the deeds at the time they were executed knew the conditions surrounding the transaction and the conditions that must be met by the lumber companies in the removal of the timber and also its distance from the place of manufacture and the means and appliances that must be constructed to cut and remove it to the place of manufacture, and they under these circumstances wrote into each deed the term of years in which the timber was permitted to stand upon the land by the grantor without the payment of any tax by the grantee and all understanding as the court held in those three cases that the timber must be removed as expeditiously as possible, under the circumstances. In determining the question of a reasonable time, it was proper to take into consideration the location of the land, its accessibility, the character and quantity of the timber thereon, the seasonableness of the weather and the facilities obtainable for cutting and removing the timber, "and all other conditions and circumstances which might affect the cutting and removal thereof." *Earl* v. *Harris, supra; Liston* v. *Chapman & Dewey Land Co.,* 77 Ark. 116.

Certainly the clause in these deeds, not found in the deeds construed in the other cases, providing that "the grantor, whenever the timber from the lands shall have been removed, should enter into full possession of the land at once, whether the time for such removal be expired or not," means something and indicates that it was contemplated that the timber might be removed before the period mentioned expired. The recital of such definite period of time after the expiration of which the grantee was required to pay the taxes on the land if the timber had not sooner been removed, supports the court's announced views that the grantee was required to remove the timber, as expeditiously as possible, without regard to the time designated and that the parties contemplated that the timber might sooner be removed but that the whole time mentioned might be required for the purpose and a longer time even, notwithstanding the grantee was proceeding continuously and with all possible dispatch.

(3)   The impossible is not required by law, nor expected to be performed. Men are reasonable creatures, and are not presumed to act otherwise in the business affairs of life. These appellees could not cut the timber upon these lands distant from their mills and remove it immediately after the deeds conveying it were made. It was impossible to do it under the conditions existing, so great was the distance intervening. They could not be expected to extend their railroads and use all their facilities to reach these lands as soon as they might possibly have been reached after the conveyance of the timber to them, without regard to the expense incident to doing so, and the consideration of the removal of their other timber nearer to the mills and more accessible, and the best method and the most practical, of reaching with proper dispatch and expeditiously cutting and removing it all. It is true no timber had been or could be removed from these lands, which were inaccessible under the circumstances, within ten years of the date of the execution of the conveyances. But it is also true that each appellee

had been all the while, from the time of their execution, increasing and extending its facilities for transportation of the timber, that each mill of each appellee had been running full time and cutting timber to the limit of its capacity, from the time of its construction and the capacity of one mill had been doubled and another trebled.

The court is of opinion that said appellees under the circumstances shown to exist, were proceeding with proper dispatch to remove the timber from these lands as expeditiously as possible within the meaning of the deeds of conveyance thereof, and that the reasonable time given for its removal by said conveyances had not expired and the trial court did not err in its decree, which is affirmed.

### OPINION ON REHEARING.

KIRBY, J.    Appellant insists, for rehearing, that the court in its opinion overlooked the fact that four certain tracts of these timber lands, towit:  (1) West half of southwest quarter of section 31, township 15 south, range 11 west;  (2) northeast quarter of northwest quarter of section 9, township 16 south, range 11 west;  (3) southeast quarter of the southeast quarter of section 32, township 15 south, range 9 west;  (4) north half of southeast quarter of northeast quarter of section 8, township 16 south, range 9 west, were conveyed by the owners to different individuals and by these grantors to the Bradley Lumber Company, and that the court's opinion stating that all the parties to the transaction knew when the timber was sold and conveyances made, that it was situated long distances from the place of manufacture and must be transported to the mills over log railways to be constructed by the different lumber companies, was not applicable to these particular tracts.

The testimony shows, however, that the timber upon these tracts of land was sold and conveyed to different agents of the Bradley Lumber Company purchasing timber, which fact was known to the grantors at the time of the conveyances of it and later by such agents transferred to the lumber company.

The first tract was conveyed by McNabb to O. F. O'Neil as the agent of the company, and Robertson said in his testimony, "I thought it belonged to the Bradley Lumber Company at the time I went to see it.

"Messrs. Neal and McNabb sold it to the Bradley Lumber Company before I got it."

The second tract in case No. 346, *Burbridge* v. *Bradley Lumber Company,* was likewise conveyed to said lumber company's agent, Gorman, the grantor, stated: "I sold O. F. Neal for the Bradley Lumber Company. He told me that."

The third tract in said suit also was sold by Hamilton to the company through T. E. Fike, its agent, and the adjoining forty was sold through C. B. Colvin, also representing the company. Hamilton stated in his testimony: "I said I sold one forty to it, Bradley Lumber Company, through Mr. Colvin and one through Mr. Fike."

The fourth tract was also included in this suit. The testimony shows it was purchased for the Bradley Lumber Company and that the grantors thereof knew the fact at the time of the conveyance, and for this tract, the original grantor made a second deed directly to the lumber company for an additional consideration in January, 1906.

(4) The original grantors of these tracts of timber and their grantées since the conveyance to the Bradley Lumber Company, are in no better position than if they had conveyed the timber at the time of the sale thereof directly to the lumber company itself, it being conveyed to the agents of said company by the grantors with knowledge that it was purchased for and to be conveyed to the lumber company.

It is insisted that a rehearing should be granted as to the tracts known as "the Ned McLain timber," in sections 22 and 28, township 15 south, range 9 west, for the reason that the testimony shows that the lumber company had built its spurs and cut the timber to within one-quarter of a mile of some of these lands; and after three or four months' cutting in the spring it took up this spur track

and extended its line further south and abandoned operation in the locality of this timber, when it could as well have moved it then as later. It is true the lumber company did have a track constructed sufficiently close to reach some of this timber in the spring of 1912 and was proceeding to do so, but the testimony shows that because of bad weather conditions, the ground got so soft as to render it impracticable to operate longer there at the time and it moved further down to higher ground. The mill, however, was burned in August and it took nearly all the remainder of the year to replace it, and the company had begun at the commencement of these suits another spur lower down on its road and had reached its location and would have removed it shortly, but for the suits. It had also arranged to exchange some of it with the other lumber companies which were ready and proceeding to remove it when the suits were filed and thereafter refused to carry out the contract.

(5) The lumber company ceased its operations in the vicinity of these lands that would have included the removal of the timber then, because of unfavorable weather conditions making it impracticable, which was followed shortly by the loss of its mill by fire, which curtailed its activity somewhat in the removal of timber, until the mill could be replaced, after which another spur track was constructed to the timber which would have been removed but for the bringing of the suits, and in view of these conditions, and considering that the time mentioned in the contract of sale, which the parties contemplated might be necessary to reach and remove the timber, was not more than one-half expired, we conclude, as announced in the first opinion that under the circumstances shown to exist relative to these particular lands the appellee was proceeding with proper dispatch to remove the timber as expeditiously as possible within the meaning of the deeds of conveyance thereof and before the reasonable time given for its removal by said conveyance had expired.

All the other matters raised by the motion were disposed of in the former opinion. The motion is accordingly denied.